# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                          No. 1:18-cr-03122-JCH-1

RAYMOND MAESTAS,

    Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Raymond Maestas' Motion to Suppress Tangible Evidence and Statements (ECF No. 20). The Court held a hearing on the motion on August 20, 2019. Having considered the motion, briefs, evidence, arguments, and being otherwise fully advised, the Court concludes that the motion should be denied.

## I.    FACTUAL BACKGROUND

The Court makes the following findings of fact, as supported by the record, in accordance with Rule 12(d) of the Federal Rules of Criminal Procedure.

Around 7:00 p.m. on the evening of February 14, 2017, Albuquerque Police Department Officer Christopher Luthi was in a Dion's Restaurant near Gibson and University Boulevards in Albuquerque when a loud car crash drew his attention. *See* Motion Hearing Transcript 13:16-17; 14:12-25-15:1-7 ("Mot. Hr'g. Tr."). He arrived on the scene and saw that a red pickup truck had rear-ended a silver one and that both trucks were blocking the roadways. *Id*. 16:7-8; 16:17. Defendant was the driver of the red truck, which sustained heavy front-end damage and had an airbag deployed. *Id*. 17:7-9; 23:23-25. Officer Luthi went to obtain a driver's license, registration, and insurance from both Defendant and the driver of the silver truck. *Id*. 17:21-22. Defendant was able to produce a Social Security card, but was otherwise unable to produce a

driver's license or proof of vehicle registration. *Id*. 18:8-11. Using Defendant's Social Security card, full name, and date of birth, Officer Luthi ran that information through a computer program that linked to Defendant's driver's license history. *Id*. 26:10-13. That query revealed that Defendant's driver's license was suspended. *Id*. 18:17-21.

Within minutes, two other APD officers, Stella Candelaria and Coty Maxwell, arrived on the scene in a police car. *Id*. 20:12-13. Officer Candelaria had recently returned to working for APD from another law enforcement agency, so Officer Maxwell's role was to provide Officer Candelaria refresher training. *Id.* 117:10-19. But for all purposes Officer Candelaria was the primary investigating officer that night. *Id*. 118:14. Officer Luthi briefed Officer Candelaria about the information concerning Defendant, and told her that Defendant kept trying to inch towards his vehicle as Officer Luthi spoke to him. *Id*. 20:18-21; 52:15-18. Both Officer Candelaria and Officer Luthi noticed a bag of brown colored liquid in the vehicle Defendant was driving, and the officers discussed between themselves whether it was urine or possibly liquid heroin. *Id*. 21:1-12. Additionally, a back-up University of New Mexico police officer who had earlier arrived on the scene told Officer Candelaria that he had frisked Defendant and that drugs may be involved because Defendant had a large amount of cash in his pocket. *Id*. 49:19-25.

Footage from Officer Candelaria's lapel camera shows the vehicles on the public roadways and impeding traffic. *See* DVD: Lapel Camera Video of Officer Stella Candelaria, Govt.'s Ex. 1 ("Candelaria Lapel Camera"). Defendant is seen standing on the scene, unhandcuffed and not close to his truck. Officer Candelaria asked Defendant whether his driver's license was valid, and Defendant answered that it was suspended. *See* Mot. Hr'g Tr. 53:1-7. The officer asked Defendant if he was on probation, and he answered that he was on parole for drug trafficking, which Officer Candelaria later confirmed using a computer system. *Id*. 68:20-23;

69:1-2. Officer Candelaria told Defendant the truck would be towed because its airbags were deployed, and asked Defendant if any drugs or weapons were in the vehicle. *See* Transcript of Lapel Camera Video of Officer Stella Candelaria, Govt.'s Ex. 1A, 6:2-8 ("Candelaria Lapel Camera Tr."). She told Defendant to not go inside his vehicle until she searched it to confirm that no weapons or drugs were within. *Id*. 6:10-12.

The officer asked Defendant for the vehicle's registration and insurance paperwork. *See* Mot. Hr'g. Tr. 50:18-24. Defendant responded that the insurance paperwork was in the glove compartment. *Id*. 53:12. Before going to the vehicle's glove box to look for the insurance paperwork, Officer Candelaria briefed Officer Maxwell, telling him that she would likely cite Defendant for lack of insurance and for having a suspended driver's license and that she would tow the truck Defendant drove. *Id*. 53:15-24.

When Officer Candelaria searched the glove compartment, she was unable to find insurance paperwork, so she moved to the rear portion of truck, opened the door, and looked if the paperwork was stored in a pocket behind the passenger seat. *Id*. 55:5-14. Lapel footage shows her shining her flashlight in the rear portion of the cabin. *See* Candelaria Lapel Camera. She shined her flashlight onto a backpack on the rear floorboard and briefly nudged the backpack away as she continued looking for Defendant's proof of insurance. *Id*. Officer Candelaria observed that the backpack's zipper was widened about six to eight inches, but otherwise there was nothing about the backpack that made her "look twice." Mot. Hr'g. Tr. 55:15-17; 56:2-10; 108:25-109:1-10.

Officer Candelaria called in the wrecker to tow the pickup truck because the airbags rendered it inoperable and because Defendant's license was suspended. *Id*. 57:3-8. This decision was made roughly eight minutes into the investigation. *Id*. 158:7-11. Albuquerque Police

3

Department policy mandates that a vehicle will be towed under two circumstances. First, when "[t]he driver has been incapacitated, hospitalized, arrested, or when the vehicle cannot be released to a responsible party." Albuquerque Police Department Procedural Orders, Towing and Wrecker Services, § 2-48-2(B)(1), ECF No. 56-1 ("SOP" or "SOPs").[1] Second, a vehicle must be towed when the vehicle is "involved in an accident to the extent that it is inoperable … and documented attempts to contact the owner have failed." *Id*. § 2-48-2(B)(2). Aside from these two circumstances, the same policy gives officers discretion to summarily impound a vehicle when, among other things, the driver's license is suspended, or the driver fails to produce proof that the vehicle is insured. *See id*. § 2-48-2(C)(1)(a), (c). When it becomes necessary to tow a vehicle, offices must inventory the entire vehicle, including "all sealed and locked containers within," *see id*. § 2-48-2(D)(3)(a), and police must conduct the inventory "at or near the time the vehicle was lawfully placed within police custody." Albuquerque Police Department Procedural Orders, Addition to the Manual, § 2-17-14(D), ECF No. 37-2.

Defendant agreed to wait inside the officers' patrol car to keep out of the winter cold, and Defendant permitted officers to handcuff him while he waited in the car. *See* Mot. Hr'g. Tr. 60:17-25 – 61:1-7. Defendant asked Officer Maxwell to retrieve his cigarettes and cell phone from within the truck. *Id*. 125:15-18. As Officer Maxwell went to get those items from the vehicle, Officer Candelaria filled-out APD's Tow-In Report, the form on which officers are required to list inventoried property. *See* SOP § 2-48-2(D)(3). Defendant sat in the backseat directly behind Officer Candelaria as she filled out the report. *See* Mot. Hr'g. Tr. 63:22-25. Although Officer Candelaria testified that she was familiar with the purpose of APD's inventory

---

[1] The Government initially submitted what appeared to be an outdated version of APD's tow policy. In a supplemental pleading the Government submitted the effective SOP at the time Defendant was arrested. *See generally* ECF No. 56-1. Throughout this Memorandum Opinion and Order the Court relies on the SOP located at ECF No. 56-1.

policy – namely, to protect the suspect's property, to protect officers and the public, and to safeguard APD from lawsuits – she did not complete the inventory report because she believed there was "nothing of value … so [she] did not write anything on that space." *Id*. 58:22-25 – 59:16; 63:9-21; Govt.'s Ex. 7. Nor did officers list small black speakers in the truck that presumably were of value. *Id*. 145:1-11.

Meanwhile, as Officer Maxwell went to the truck to get Defendant's cigarettes and cell phone, he began inventory searching the vehicle. *See* Mot. Hr'g. Tr. 126:21-25. He spent about two-and-a-half minutes inventorying the truck. *Id*. 147:22-24. Seeing the partially opened backpack on the truck's floorboard, Officer Maxwell shined his flashlight within the zipper's opening and saw a gun within. *Id*. 129:10-12; 129:19-25 – 130:1-3.

Officer Maxwell came back to the police vehicle that Officer Candelaria and Defendant were in, and whispered to Officer Candelaria that he found a gun in the backpack in the truck. *Id*. 65:13; 65:22-25 – 66:1-6. Officer Candelaria then went to the truck and shined her flashlight within the backpack's opening, revealing the gun. *Id*. 66:16-17. She widened the backpack's zipper further, revealing a brown tar substance inside. *Id*. 68:11-13. Once she observed the gun and substance, she stopped inventory searching the truck and seized the backpack. *Id*. 70:11-13. Once again, both Officer Candelaria and Officer Maxwell failed to make a written inventory of the backpack, gun, and drugs. *Id*. 70:11-14; 110:21-25.

Officer Candelaria then called Defendant's parole officer and explain what she found. *Id*. 69:2-5. The parole officer revoked Defendant's parole and authorized Officer Candelaria to arrest Defendant for parole violation, which Officer Candelaria immediately did. *Id*. 69:3-5; Def.'s Ex. A at 2. The officer then asked Defendant what he knew about the backpack and if it

5

belonged to him. *See* Mot. Hr'g. Tr. 70:20-21. He responded that it possibly belonged to a friend. *Id*. 70:24.

In the course of the investigation, Officer Candelaria also learned from running the truck's license plate that it belonged to Jessica Martinez. *Id*. 64:7-15. Defendant acknowledged to the officer that Ms. Martinez was his girlfriend and Defendant told her that he had been driving Ms. Martinez's car for about three weeks. *Id*. 64:18-25 – 65:1-3; Def.'s Ex. A at 2. Defendant would not, however, provide Ms. Martinez's phone number. *See* Def.'s Ex. A at 2.

In her post-accident report, Officer Candelaria wrote that she "searched the vehicle pursuant to being towed located the [] backpack" and "seized the [backpack] and its contents and … tagged [it] into evidence." Def.'s Ex. A at 2. Officer Maxwell wrote in a supplemental report that "while completing an inventory search pursuant to tow a black 9mm Ruger LC9 was located." Govt.'s Ex. 8 at 3. According to Defendant's motion and the Government's response brief, about one week after the car crash, while in custody at the jailhouse, Defendant waived his *Miranda*[2] rights and gave a recorded statement to law enforcement officers. During this time officers also executed search warrants of Defendant's DNA and cell phones, leading to text messages describing drug trafficking.

Defendant was originally indicted on September 25, 2018, and on June 27, 2019 a federal grand jury returned a four-count second superseding indictment against Defendant gun and drug charges. *See* ECF No. 51.[3]

---

[2] *Miranda v. Arizona* 384 U.S. 436 (1966).

[3] Defendant is accused of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) (Count I); possessing with intent to distribute five grams and more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (Count II); possessing with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count III); and using and carrying a firearm during and in relation to a drug trafficking crime, and

## II. FOURTH AMENDMENT OVERVIEW

The Fourth Amendment provides in relevant part: "The right of the people to be secure … against unreasonable searches and seizures." U.S. Const. amend. IV. In general, law enforcement officers must obtain a warrant supported by probable cause before conducting a search or seizure. *See Kentucky v. King*, 563 U.S. 452, 459 (2011). "When a search violates the Fourth Amendment, the exclusionary rule normally dictates that evidence obtained as a result of that search be suppressed." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005).

## III. DISCUSSION

### A. Does Defendant Have Standing to Challenge the Search?

The Government argues that Defendant lacks standing to contest the search of the truck because he failed to introduce evidence showing that his girlfriend, Jessica Martinez, loaned him the vehicle. To prove that a search violated the Fourth Amendment, the defendant must show that he had a legitimate expectation of privacy in a searched place or item. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). "Fourth Amendment rights are personal and cannot be claimed vicariously. The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (citations and quotation marks omitted).

When a defendant moves to suppress evidence found in a car in which he is not the registered owner, he must establish "that he gained possession from the owner or someone with authority to grant possession." *Id.* (citations and quotation marks omitted). Stated differently, "[a] defendant does not have standing to contest a search where he does not establish a link

---

possessing a firearm in furtherance of such crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count IV).

between himself and the registered owner." *Id*. In analyzing whether the defendant has carried his burden of establishing that necessary link, the court considers the following non-dispositive factors: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." *Id*; *United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003).

While Defendant did not assert ownership over the backpack or testify to his expectation of privacy at the suppression hearing, Defendant pointed to his conversation with Officer Candelaria that Jessica Martinez was his girlfriend. Officer Candelaria's police report describes her discussion with Defendant that he had been driving Ms. Martinez's car for about three weeks. The officer's own check of the truck's license plate showed that Ms. Martinez was the truck's registered owner. This evidence, in the aggregate, is sufficient to establish a link between Defendant and Ms. Martinez, the truck's registered owner, and to show that Ms. Martinez was "someone with the authority to grant possession." *Valdez Hocker*, 333 F.3d at 1210. *Cf. Eckhart*, 569 F.3d at 1275 (defendant failed to establish standing where he produced no evidence that the alleged lender of the vehicle had lawful possession of the car in the first place and defendant could not explain his relationship to the vehicle's registered owner). Defendant has standing to challenge the search of the truck.

**B. Could Officers Impound and Inventory Search the Truck and Backpack without a Warrant?**

In his motion, Defendant argues that the search of his car cannot be justified as an inventory search because officers failed to produce an inventory on the Tow-In Form. He therefore believes that inventorying the car was a pretext for finding criminal evidence.

Defendant additionally argues that the "plain view" doctrine[4] did not justify the seizure of the evidence within the backpack because it was not immediately apparent until Officer Maxwell physically opened the backpack's zipper. As the Court will next explain, officers lawfully inventory searched Defendant's vehicle and had the right to physically open his backpack. It is therefore unnecessary to address Defendant's plain view argument.

The Supreme Court has determined that one exception to the warrant requirement is for inventory searches of lawfully seized automobiles. *See Illinois v. Lafayette,* 462 U.S. 640, 643 (1983). An inventory search of a lawfully impounded automobile is reasonable even if it is conducted without a warrant and in the absence of probable cause to believe that criminal evidence will be discovered. *See South Dakota v. Opperman*, 428 U.S. 364 (1976); *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) ("inventory searches need not be supported by a warrant or probable cause."). "It is common practice for the police to conduct an inventory of the contents of vehicles they have taken into their custody or are about to impound." *Id*. (citation and quotation marks omitted). "Such inventories 'are now a well-defined exception to the warrant requirement of the Fourth Amendment.'" *Id*. (citing *Colorado v. Bertine,* 479 U.S. 367, 371 (1987)). They are treated as administrative searches rather than criminal investigations and serve the protection of "the owner's property while it remains in police custody, the … police against claims or disputes over lost or stolen property, and the … police from potential danger." *Opperman,* 428 U.S. at 369.

However, if the administrative search is merely a pretext for a criminal investigation then evidence found during an inventory may be inadmissible. The Tenth Circuit has identified two criteria for inventory searches to be reasonable under the Fourth Amendment. *See Tueller*, 349

---

[4] *See Harman v. Pollock*, 586 F.3d 1254, 1264 (10th Cir. 2009) (listing elements of plain view doctrine).

F.3d at 1243. First, such searches "are reasonable only if conducted according to standardized procedures." *Id*. Second "[t]he policy or practice governing inventory searches should be designed to produce an inventory, [] in other words, an inventory search must be justified by the administrative purposes of such searches." *Id*. (citations and quotation marks omitted). "[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Id*. (quoting *Florida v. Wells,* 495 U.S. 1, 4 (1990)). The government carries the burden of demonstrating reasonableness. *See United States v. Taylor*, 592 F.3d 1104, 1107 (10th Cir. 2010); *see also United States v. Sanders*, 796 F.3d 1241, 1244 (10th Cir. 2015) ("The government bears the burden of proving that its impoundment of a vehicle satisfies the Fourth Amendment."). If "searching agents act in bad faith or solely for the purpose of investigation … [t]he fruit of the evidence, however, will be suppressed." *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997).

As to the first prong – whether officers acted according to standardized criteria – APD has a comprehensive towing and impoundment policy, which the Government introduced into the evidentiary record. The policy sets forth the circumstances under which police "will" or may tow a car, establishes procedures officers must follow in towing a car, and requires an inventory search of the vehicle in custody and containers therein. Defendant suggested at the suppression hearing that officers could have not have permissibly towed the inoperable vehicle under § 2-48-2(B)(2) because they made no documented attempts to contact its registered owner, Ms. Martinez. That SOP states that a vehicle "will" be towed when "the vehicle has been … involved in an accident to the extent that it is inoperable … and documented attempts to contact the owner have failed." SOP § 2-48-2(B)(2). However, the Court is not persuaded that officers' failure to document attempts to contact Ms. Martinez means that officers arbitrarily impounded the

vehicle. For one, inventory searches are not "totally mechanical" procedures. *Wells*, 495 U.S. at 4. Second, various other portions of APD's policy gave officers ample authority to impound the vehicle. As relevant here, Officer Candelaria had the legal right to summarily impound the truck because Defendant's driver's license was suspended. *See* § 2-48-2(C)(1)(b). This same policy gave her discretion to take the truck into custody because Defendant did not have vehicle insurance. *See id*. § 2-48-2(C)(1)(a). Officers acted according to a set routine. Again, "[i]t is common practice for the police to conduct an inventory of the contents of vehicles they have taken into their custody or are about to impound." *Tueller*, 349 F.3d at 1243 (10th Cir. 2003). There simply is "no suggestion whatever that [the] standard procedure[s] ... [were] a pretext concealing an investigatory police motive." *Opperman*, 428 U.S. at 376.

Defendant also contends that the search was conducted for investigatory reasons by pointing to a backup officer's "tip" to Officer Candelaria associating Defendant with narcotics because Defendant had a sizeable amount of cash on his person. *See* Mot. Hr'g. Tr. 225:23. Defendant is correct that the backup officer made this report early in the investigation and before Officer Candelaria impounded the truck. However, the Court does not find Defendant's argument persuasive.

First, Defendant's argument significantly downplays other key facts known to officers. Officers were on the scene in the first place because Defendant himself caused a car wreck; they were not investigating a drug crime. Within minutes of arriving, Officer Candelaria learned from Officer Luthi that Defendant drove on a suspended license, giving her the right to summarily tow the truck under SOP § 2-48-2(C)(1)(b). In addition, the officer knew that the truck's airbags were deployed, Defendant could not produce insurance, nobody else could take custody of the truck

11

because Defendant drove alone[5], and the truck impeded traffic on a public street. *See Opperman*, 428 U.S. at 369 (the "authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.")

On the basis of these key facts, Officer Candelaria impounded the truck roughly eight minutes into her investigation. Nowhere in her testimony did she indicate that she was searching for criminal evidence. Her lapel camera shows that her first physical entry into the truck was to look for Defendant's insurance paperwork. She expressly testified that she did not suspect Defendant of criminal activity, and Officer Maxwell did not search inside the backpack until Officer Candelaria had already decided to impound the truck. *Cf. United States v. Edwards*, 632 F.3d 633, 644 (10th Cir. 2001) (finding that inventory search of vehicle was a ruse where the decision to impound the car was not made until *after* the search revealed incriminating evidence and an officer testified that he was "searching for evidence of the crime."). The Tenth Circuit has approved the legality of an impoundment in similar circumstances. *See United States v. Horn*, 970 F.2d 728 (10th Cir. 1992) (impoundment proper where defendant, traveling alone, was arrested on an outstanding warrant and could not prove ownership of vehicle); *Haro-Salcedo*, 107 F.3d at 772 (impoundment reasonable where neither driver or passenger could prove ownership of vehicle with suspicious license plate); *See id*. (citing *United States v. Long*, 705

---

[5] Defendant argued at the suppression hearing that the decision to tow the truck was unreasonable because officers had available Ms. Martinez's address and could have contacted her to take custody of the truck. However, even if releasing the truck to Ms. Martinez was an option, "the fact that alternatives to impoundment may have existed does not mean impoundment was per se unreasonable." *United States v. Andras-Gallardo*, 3 Fed. Appx. 959, 963 (10th Cir. 2001) (citing *Colorado v. Bertine,* 479 U.S. at 374) (holding that the police need not give a motorist "an opportunity to make alternative arrangements" that avoid impoundment and inventory)).

F.2d 1259, 1262 (10th Cir. 1983) (holding that police properly impounded vehicle pending proof of ownership)).

Second, "a police expectation that the search will reveal criminal evidence" does not render the search unreasonable if the search is conducted under standardized procedures. *United States v. Lopez*, 547 F.3d 364, 372 (2d Cir. 2008). Indeed, even if the circumstances suggest "a probability of discovering criminal evidence," *id.*, "it is inconsequential that officers may be motivated in part by criminal investigative objectives." *United States v. Cruz*, No. CR 10-1730 MCA, 2011 WL 13289808, at *11 (D.N.M. Apr. 27, 2011) (quoting *Lopez*, 547 F.3d at 372)); *see also United States v. Mundy*, 621 F.3d 283, 294 (3rd Cir. 2010) (officers' initial observations of suspected drugs in defendant's car immediately after stopping him did "not suggest that the subsequent inventory search was conducted in bad faith."); *United States v. Cecala*, 203 F.3d 836, at *2 (10th Cir. 2000) ("[w]hile mixed motives or suspicions undoubtedly exist in many inventory searches, such motives or suspicions alone will not invalidate an otherwise proper inventory search.").

As to whether the scope of the on-the-scene inventory search extended to the backpack, the answer is yes. The Supreme Court ruled in *Colorado v. Bertine,* 479 U.S. at 375 that officers may without a warrant or probable cause open closed containers[6] while conducting an inventory search of an impounded vehicle. During the inventory search of the defendant's impounded vehicle, an officer opened a closed backpack, a bag within the backpack, and closed metal canisters located inside the bag, leading to the discovery of contraband. 479 U.S. at 369. The

---

[6] A "container" refers to "any object capable of holding another object," including "closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like." *New York v. Belton*, 453 U.S. 454, 461 (1981).

Supreme Court reversed suppression of the evidence, reasoning that the standard procedures governing the inventory search "mandated the opening of closed containers and the listing of their contents." *Id.* at 374 n. 6. Accordingly, the court held that the evidence found during the inventory search of the defendant's vehicle was admissible. *Cf. Florida v. Wells*, 495 U.S. at 4-5 (holding that marijuana discovered after police forced opened a locked suitcase located in the trunk of an impounded vehicle was properly suppressed because the police department had "*no policy whatever* with respect to the opening of closed containers encountered during an inventory search.") (emphases added).

Here, APD had in place pre-existing rules requiring the inventory search of an impounded vehicle. *See* SOPs § 2-48-2(D)(3). This same policy requires the inventory search of the entire vehicle, including containers. *See id*. § 2-48-2(D)(3)(a). Because the backpack was only partially open, officers could not immediately determine the contents within. Officers had to physically open the backpack under the policy. And they had to do this at or near the time of impoundment. *See* § 2-17-14(D). Established police department policies requiring the opening of containers are "unquestionably permissible." *Wells*, 495 U.S. at 4. In *Bertine* itself the police opened and searched a closed backpack inside the defendant's vehicle before the vehicle was taken to an impoundment lot. 479 U.S. at 368-69. The APD officers' method of using their hands or flashlight to expand the backpack's zipper was within the bounds of the lawful inventory search. In sum, officers followed standardized criteria set forth by APD and acted in good faith pursuant to those established policies when they inventory searched the truck and backpack.

As to the second factor – whether APD's inventory search policy produced an inventory – Defendant argues that Officer Candelaria failed to do the hallmark of an inventory search: make an inventory list. Defendant argues that the search was therefore a "general rummaging."

Def.'s Mot. at 9. Defendant is correct that officers failed to make a written inventory. The inventory section of the Tow-In Report is entirely blank, even though SOP § 2-48-2(D)(3) required officers to list the inventoried property. However, the Court does not agree that this is proof of a general rummaging because officers undertook the search pursuant to standardized procedures. In *United States v. Richardson*, 229 F.3d 1145 (Table), 2000 WL 1273425, *2 (4th Cir. Sept. 5, 2000), officers found narcotics under the hood of the defendant's truck during a lawful inventory search but, like here, produced no inventory. Rejecting the defendant's Fourth Amendment challenge, the Fourth Circuit held that because the officers initiated the inventory search in accordance with established policy, "the failure to complete an inventory list does not render suspect either the motive for conducting the search or the reasonableness thereof." *Id.*

Similarly, in *Bertine* the Supreme Court upheld the inventory search of the defendant's vehicle even though it was characterized as "slip-shod." 479 U.S. at 369. The inventorying officer failed to list numerous valuable items found in the defendant's vehicle, including credit cards, money, and an envelope marked "rent." *Id*. at 383 (Marshall, J., dissenting). The illegal drugs found in the defendant's back appeared on a property form completed later by a different officer. *Id*. Here, officers failed to complete the Tow-In Form, that much is clear. But these cases convince the Court that such a failure did not necessarily amount to a general rummaging because officers lawfully impounded Defendant's vehicle in the first place and otherwise followed APD's standard procedures. However, even if the search could not be justified as an inventory search because of the failure to produce an inventory on the Tow-In Form, the evidence obtained from the backpack would have been inevitably discovered, as the Court next explains.

**C. Would Officers Have Inevitably Discovered the Gun and Drug Evidence?**

In its response brief, the Government argues that all of the incriminating evidence against Defendant would have been inevitably discovered.[7] *Nix v. Williams,* 467 U.S. 431 (1984), establishes that the inevitability of discovering certain evidence through lawful means removes the taint from that evidence even though it was originally discovered by unlawful means. "The inevitable discovery doctrine provides an exception to the exclusionary rule, and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005). "Those lawful means include an inventory search." *Tueller*, 349 F.3d at 1243. "The government has the burden of proving by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation." *United States v. Souza*, 223 F.3d 1197, 1203 (10th Cir. 2000).

The Tenth Circuit has "repeatedly applied the inevitable discovery doctrine to evidence produced by an improper inventory search where the search was preceded by a lawful impoundment." *United States v. Andas-Gallardo*, 3 F. App'x 959, 964 (10th Cir. 2001) (citing *Haro-Salcedo,* 107 F.3d at 773-74 and *Horn,* 970 F.2d at 732). Thus, in *Haro-Salcedo*, the Tenth Circuit held that notwithstanding the officer's illegal inventory search of a vehicle, cocaine evidence would have been inevitably discovered following the defendant's arrest and impoundment because city police department policy mandated an inventory search. *See also Horn*, 970 F.2d at 732 ("Even assuming arguendo that the post-arrest search beside the highway was improper and should have been conducted in a different manner, … it was inevitable that the weapons would have been discovered and that defendant would have been charged with their

---

[7] Defendant filed no reply brief and thus did not counter the Government's inevitable discovery theory that a standard inventory search would have revealed the evidence in the backpack.

possession."); *Sitlington*, 527 Fed. App'x 788, 792 (10th Cir. 2013) (officers inventory searched a lawfully impounded truck but failed to detail the personal items they found as required by city police department policy. Rejecting the defendant's motion to suppress gun and drug evidence based on the inaccurate inventory, the Tenth Circuit held that "the rifle would have been inevitably discovered in a properly-conducted inventory search.").

Here, APD policy mandated an inventory search of a towed vehicle "at or near the time the vehicle was lawfully placed within police custody," SOP § 2-17-14(D), and "all sealed … containers within." SOP § 2-48-2(D)(3)(a). Even if officers erred by not completing the initial Tow-In Report, the gun and drug evidence within the backpack would have been inevitably discovered and Defendant would have been charged with their possession. *See Horn*, 970 F.2d at 732. The Court also denies Defendant's motion to suppress with respect to evidence of text messages, a DNA sample, and statements because those are not fruits of an illegal search.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED that** Defendant Raymond Maestas' Motion to Suppress Tangible Evidence and Statements (**ECF No. 20**) is **DENIED**.

**IT IS SO ORDERED**.

_____
JUDITH C. HERRERA
SENOR U.S. DISTRICT JUDGE